UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JANET MARINO,

        *Plaintiff*,

    v.

BRIGHTON GARDENS OF
MOUNTAINSIDE,

        *Defendant*.

Civil Action No. 20-
    7142(MEF)(MAH)

**OPINION and ORDER**

**Table of Contents**

I.    Background
      A. Evidence
      B. Procedural History
      C. The Motion
II.   Jurisdiction
III.  Substantive Law
IV.   Standard of Review
V.    Breach of Contract
      A. Non-Payment
            1. Breaches
            2. Timing
            3. Legal Significance of Breaches
      B. Damages
      C. Conclusion
VI.   Intentional Infliction of Emotional Distress
      A. Physical Injury
      B. Expert Testimony
            1. Common Knowledge
            2. Genuine and Serious Mental Distress

1

    C. Severity

VII. Conversion

VIII.   Conclusion

An assisted living facility resident claimed she did not receive services she was entitled to.

The resident sued the manager of the facility for breach of contract, intentional infliction of emotional distress, and conversion of personal property.

The manager now moves for summary judgment.

The motion is granted in part and denied in part.

## I.   **Background**

### A. **Evidence**

The evidence as relevant for now is as follows.

The assisted living facility resident ("the Resident") lived at the facility from August of 2018 to March of 2020.  <u>See</u> Plaintiff's Responses to Defendant's Statement of Undisputed Facts ¶¶ 1, 8.  The facility was managed by the Defendant.  <u>See</u> Notice of Removal at 1–2.[1]

The relationship between the Resident and the Defendant was governed by a contract.  <u>See</u> <u>generally</u> Motion for Summary Judgment, Ex. 4 (Residency Agreement).

Under the contract, the Resident was to pay set monthly fees.  <u>See</u> <u>id</u>. at 6, ¶¶ A, D, Exs. 1–3.  And the Defendant was to manage the provision of food, living space, and appropriate care.  <u>See</u> <u>id</u>. at 21–24.

### B. **Procedural History**

-----

[1] The Defendant-facility manager was apparently sued in the wrong name, <u>see</u> Notice of Removal at 2, but neither party has moved to clean up the caption.

In April of 2020, the Resident sued in a New Jersey state court. See Notice of Removal, Ex. 1 (Complaint).

In June of 2020, the Defendant removed the case to federal court.  See id.

Discovery was undertaken, and in April of 2023 the Defendant moved for summary judgment.  The motion was fully briefed as of May, and in June the case was re-assigned to the undersigned.

The motion for summary judgment is now before the Court.

### C. The Motion

The Court's analysis of the motion is in eight parts.

The first three parts concern matters that are relevant across the board: jurisdiction (Part II); the question of what body of substantive law applies here (Part III); and the summary judgment standards that govern the Defendant's motion (Part IV).

The next three parts are claim-by-claim.  Part V addresses the Plaintiff's breach of contract claim.  Part VI considers her intentional infliction of emotional distress claim.  And Part VII takes up the Plaintiff's conversion claim.

Part VIII is a brief conclusion.

### II.  Jurisdiction

The Court's jurisdiction is invoked based on the diversity statute.  See Notice of Removal at 1.[2]

The statute requires that "no plaintiff be a citizen of the same state as any defendant."  Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 419 (3d Cir. 2010) (quoting Exxon Mobil Corp. v. Allapattah Svcs. Inc., 545 U.S. 546, 553 (2005)); see generally 28 U.S.C. § 1332(a).

---

[2] Neither party argues there is a jurisdictional issue here.  But the Court has an "independent obligation" to consider jurisdiction.  Hartig Drug Co. Inc. v. Senju Pharm. Co., 836 F.3d 261, 267 (3d Cir. 2016) (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)).

The Defendant is a corporation.  See Notice of Removal at 2.  A corporation's citizenship for diversity jurisdiction purposes is its state of incorporation and also its principal place of business.  See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 34 (3d Cir. 2018).

Here, the Defendant was alleged to be a Delaware corporation with its principal place of business in Virginia.  See Notice of Removal at 2.  For her part, the Resident was alleged to be a citizen of New Jersey.  See id.

Accordingly, the parties were diverse --- Delaware and Virginia on one side, New Jersey on the other.

But the Resident passed away, and her daughter, the administrator of her estate ("the Administrator"), was substituted as the Plaintiff.  See Order Granting Motion to Substitute Party (March 1, 2021).

This, though, does not change the analysis.  Under the diversity statute, "[t]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent."  28 U.S.C. § 1332(c)(2).[3]  The Administrator therefore counts as a citizen of New Jersey, because the Resident did.

Bottom line: the Court has diversity jurisdiction --- because this lawsuit pairs a New Jersey Plaintiff (the Administrator, whose citizenship follows the Resident's) with a Delaware/Virginia Defendant.[4]

### III.  Substantive Law

---

[3]  See generally 13E Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 3606 (3d ed. 2023); Golden ex rel. Golden v. Golden, 382 F.3d 348, 352 n.1 (3d Cir. 2004) ("In diversity actions involving estates, the courts look to the citizenship of the decedent to determine jurisdiction."), abrogated on other grounds by Marshall v. Marshall, 547 U.S. 293 (2006).

[4] Under the statute, there is another requirement: the amount in controversy must exceed $75,000.  See 28 U.S.C. § 1332(a).  Here, that requirement was satisfied.  See Notice of Removal at 2-3.

What law applies here?

The Complaint alleges three common law claims.  But it does not say which state's common law is in play.

No matter.  Both parties' briefs assume New Jersey common law controls.  See Motion for Summary Judgment at 2-4, 6, 8, 10-14; Opposition to Summary Judgment at 5-14.  And "[w]here parties' briefs assume that a particular forum's law controls, 'such implied consent . . . is sufficient to establish choice of law.'"  TekDoc Servs., LLC v. 3i-Infotech Inc., 2013 WL 2182565 at *10 n.12 (D.N.J. May 20, 2013) (quoting Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)); accord Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 152 (2d Cir. 2016); Pre-Settlement Fin., LLC v. Ellis, 2020 WL 5743036, at *4 n.3 (D.N.J. Sept. 24, 2020), aff'd, 2021 WL 2104860 (3d Cir. May 25, 2021), and aff'd, 2021 WL 2104860 (3d Cir. May 25, 2021).

The Court will apply New Jersey law.

### IV.   Standard of Review

As noted, the Defendant has filed a motion for summary judgment. Such a motion should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Dupree v. Younger, 598 U.S. 729, 737 (2023); Cellco P'ship v. White Deer Twp. Zoning Hearing Bd., 74 F.4th 96, 100 (3d Cir. 2023).  "A factual dispute is material if it might affect the outcome of the suit under the governing law." Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 345 (3d Cir. 2022) (cleaned up); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Such a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]"  SodexoMAGIC, LLC v. Drexel Univ., 24 F.4th 183, 203-204 (3d Cir. 2022).

"[A] district court may not make credibility determinations or engage in any weighing of the evidence[.]"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004).  Rather, the court must "view the facts in the light most favorable to the non-moving party and [draw] all reasonable inferences in that party's favor."  Canada, 49 F.4th at 345 (cleaned up); accord Tolan v. Cotton, 572 U.S. 650, 660 (2014).

The party moving for summary judgment has the "initial responsibility" of showing the basis for its motion and demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party does so, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324.

"[I]f the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial,' then summary judgment is appropriate for the moving party." SodexoMAGIC, LLC, 24 F.4th at 203-04 (quoting Celotex Corp., 477 U.S. at 322) (second and third alterations in original); see also Fed. R. Civ. P. 56(c).

## V.    Breach of Contract

The Plaintiff's first claim is breach of contract.  See Complaint ¶¶ 17-20.

As to this claim, the Defendant seeks summary judgment for two reasons.  First, because the Resident did not make certain payments that she was supposed to.  See Motion for Summary Judgment at 2-5.  And second, because the Plaintiff has not specified the damages that would follow from the alleged breach of contract.  See id. at 6-8.

Take each argument in turn.

### A. Non-Payment

While the Resident lived at the assisted living facility, she was contractually required to make monthly payments.[5]  See Residency Agreement at 6, ¶¶ A, D, Exs. 1-3.  She stopped making them in December of 2019, about three months before she moved

---

[5] Recall that the Plaintiff here was the Resident, until she died; her daughter, the Administrator, is now the Plaintiff. The Defendant is the manager of the assisted living facility where the Resident lived from August of 2018 to March of 2020.

out.  See Plaintiff's Responses to Statement of Undisputed Facts
¶ 11.

The Defendant argues: because the Resident stopped making her
payments under the contract, she cannot sue for breach of it.
See Motion for Summary Judgment at 2-5.

But this is not persuasive.

The Plaintiff has put forward sufficient evidence that the
Defendant breached the contract (Part V.A.1), and did so before
the Resident stopped paying under the contract in December 2019
(Part V.A.2).

And under New Jersey law, a party that breaches a contract
cannot rely on the other party's later breach of the contract to
excuse its own prior breach (Part V.A.3).  But that is what the
Defendant is trying to do.  The Defendant is arguing that its
pre-December 2019 breaches of contract are excused, such that
summary judgment should be granted, because in December 2019 the
Resident breached the contract herself, by not paying required
fees.  This argument does not work.  The Defendant's earlier
breach is not washed away by the Resident's later breach.

### 1. Breaches

The Plaintiff has presented evidence as to multiple breaches of
contract by the Defendant.  Six are relevant here.

First, the contract promised the Resident "clean conditions."
Residency Agreement at 22.

But the Administrator testified she "often found" the Resident's
room "smelled of urine," with "juices" "coming from the fridge"
and food "spread around the apartment."  See Affidavit of
Administrator ¶ 31.  The Resident was left "basically sitting in
urine all day . . . many, many times."  Deposition of
Administrator at 82:5-14; 96:17-21.  The refrigerator "always
looked [to the Administrator] like there was some kind of
spillage of some juices or something."  Id. at 61:11-24.  The
Administrator also testified she saw "food all over tabletops

and floors" and "[f]ood stuck in carpet causing unsanitary
conditions." Id. at 96:24-97:6.[6]

Second, the contract promised the Resident
"safe . . . conditions."  Residency Agreement at 22.

But the Administrator testified she repeatedly saw the Resident
press her emergency pendent and receive no response from
facility personnel, sometimes for over an hour.  See Deposition
of Administrator at 38:8-23.  This is not "safe," and neither is
a persistently unsanitary room, as described above.

Third, the contract promised the right to participate in "meals,
recreation, and social activities."  Residency Agreement at 23.

But the Administrator testified the Resident was put at a table
in the assisted living facility's dining room --- alone, for
three months.  See Affidavit of Administrator ¶ 25.  Especially
for a person in an assisted living facility, shared meals can be
an important "social activit[y]."  Residency Agreement at 23.
This is common sense.  In addition, it is reflected in the
relevant literature, see, e.g., Jens Kofod, Building Community
through Meals in the Care Home Setting, 15 Food, Culture & Soc'y
665 (2012), Ann Christine Frankowski et. al, The Dining Room as
the Locus of Ritual in Assisted Living, 3 Generations 41 (2011),
and suggested in the record.  See Deposition of Administrator at
158:8-159:4 ("I was very upset that after many requests of her
having people that she could socialize with and eat with, she
wound up in a dining room eating alone").

There is also evidence the Defendant did not let the Resident
take scheduled day trips.  See Affidavit of Administrator ¶ 27;
Deposition of Administrator at 75:2-12, 97:11-99:9.  Such day
trips can also be an important "social activit[y]."  This, too,
is common sense.  See also Deposition of Administrator at 75:2-
12 (the Administrator testified she moved the Resident into the
facility "based on the fact that she would socialize.  She would
go on day trips.").[7]

---

[6] The Plaintiff's evidence includes photographs of the Resident's
room.  See Opposition to Summary Judgment, Ex. 3; see also
Deposition of Administrator at 96:24-97:6.

[7] Under the contract, participation in social activities "may be

<u>Fourth</u>, the contract promised a "right to privacy."  Residency
Agreement at 21.

But the Plaintiff's evidence is that the Resident's room was
accessed on an unauthorized basis by another resident of the
assisted living facility.[8]  <u>See</u> Affidavit of Administrator ¶¶ 17–
19; Deposition of Administrator at 122:2-24.

<u>Fifth</u>, the contract promised the Resident would "receive a level
of care and services that addresses the Resident's changing
physical and psychosocial status."  Residency Agreement at 21.

But the Administrator testified she found the Resident bedside –
–– apparently not having been helped into bed by facility staff,
despite not having the ability to get into bed on her own.  <u>See</u>
Affidavit of Administrator ¶ 35; Deposition of Administrator at
140:2-141:12.  On one occasion, the Resident was found on the
floor.  <u>See</u> Deposition of Administrator at 140:20-141:2.[9]

<u>Sixth</u>, the contract promised the Resident the "right to have a
private telephone in . . . her living quarters[.]"  Residency
Agreement at 23.

But the phone was unplugged "continuously," including after the
Administrator complained to staff at the assisted living
facility.  <u>See</u> Deposition of Administrator at 33:22-34:14;
Affidavit of Administrator ¶¶ 37, 39; <u>see</u> <u>also</u> Deposition of

_____

restricted or prohibited only upon the written recommendation of
[the Resident's] physician, advanced practice nurse, or
physician assistant."  Residency Agreement at 23.  There is no
indication of such a recommendation.  Indeed, the evidence is
the Defendant did not allow the Resident to participate in day
trips for lack of staff.  <u>See</u> Affidavit of Administrator ¶ 27.

[8] Facility personnel are said to have told the Administrator
about the unauthorized access, <u>see</u> Deposition of Administrator
at 46:11-17, after "several months" of the Administrator making
complaints.  Affidavit of Administrator ¶ 19.

[9] Note also that the Resident was on a waitlist to be moved to a
facility memory care unit but was not transferred before she
moved out.  <u>See</u> <u>id</u>. ¶ 36.

Administrator at 33:14-35:8 (testimony from the Administrator: the Defendant admitted disconnecting the Resident's phone).

Adding all this up, the Plaintiff has introduced sufficient evidence that the Defendant breached the contract that governed its relationship with the Resident.[10]

### 2. Timing

For reasons to be discussed below in Part V.A.3, it matters[11] whether the Defendant's breach of the contract took place before or after the Resident's breach.  The Resident's breach of the contract happened in late December 2019,[12] when she stopped making contractually-required payments.

So: were the Defendant's breaches of the contract pre-December 2019 or post-December 2019?

The former.  The evidence is that the Defendant's breaches occurred on a fairly continuous basis throughout the August 2018 to March 2020 period[13] that the Resident lived at the facility. Accordingly, the breaches mostly happened before December 2019.

The basis for this conclusion is as follows.

For the first and second breaches, as to unclean and unsafe conditions --- the unclean refrigerator, the food spread around the Resident's room, and the Resident sitting in urine were all

---

[10] The Defendant challenges the admissibility, at least in a general sense, of the evidence the Plaintiff has put forward on intentional infliction of emotional distress.  See, e.g., Motion for Summary Judgment at 13; Summary Judgment Reply Memorandum at 9, 11.  But the Defendant presses no objection to the admissibility of the Plaintiff's breach of contract evidence. See Motion for Summary Judgment; Summary Judgment Reply Memorandum.

[11] But compare footnote 25 below.

[12] See Plaintiff's Responses to Statement of Undisputed Facts ¶ 11; Deposition of Administrator at 59:16-24.

[13] See Plaintiff's Responses to Defendant's Statement of Undisputed Facts ¶¶ 1,8.

fairly continuous occurrences.  See Affidavit of Administrator ¶ 31; Deposition of Administrator at 60:13-16, 61:11-24, 82:5-14, 96:17-21.  In addition, the Defendant's failure to respond to the Resident pressing the emergency pendent was a recurring issue.  See Deposition of Administrator at 38:8-23.[14]

For the third breach, the Resident being seated alone and not being included on day trips --- these were continuous and long-term concerns.  See Affidavit of Administrator ¶ 25, 27; Deposition of Administrator at 75:2-12.

For the fourth breach, the evidence is that the Resident's room was accessed on an unauthorized basis before December of 2019, in June 2019.  See Affidavit of Administrator ¶¶ 18-19.

For the fifth breach, as to the Resident not being placed in bed by staff, the evidence is that this, too, was continuous.  See Affidavit of Administrator ¶ 35; Deposition of Administrator at 140:2-141:12.[15]

For the sixth breach, the Administrator testified the Defendant unplugged the Resident's phone "continuously."  Deposition of Administrator at 33:22-34:14; see also Affidavit of Plaintiff ¶ 37 (Administrator's testimony: the Resident's phone was unplugged in August of 2019).

In sum: affording all "reasonable inferences" to the non-moving Plaintiff, as the Court must, Canada, 49 F.4th at 34, there is sufficient evidence that the Defendant's breaches of the contract happened continuously, such that most took place before December 2019.  In addition, there is affirmative evidence that certain breaches happened before December 2019.

---

[14] There is also some more specific evidence on timing.  The Administrator testified that the Resident's refrigerator, prior to December 2019, "always looked like there was some kind of spillage of some juices or something."  Id. at 61:11-24.  And the Administrator testified that, in December 2019, the Resident's room was "filthy."  See Deposition of Administrator at 61:7-10.

[15] Plus some specific timing evidence: the Administrator testified the Resident was found on the floor in November of 2018.  See Deposition of Administrator at 140:20-141:2.

### 3. Legal Significance of Breaches

The preceding two sections collect the evidence that the
Defendant breached the contract --- and did so before the
Resident breached the contract, when she stopped making her
required payments in December of 2019.

Why does this sequencing matter?

Because under New Jersey law, "a party in breach of contract
cannot rely on the other party's subsequent failure to perform
to excuse its own prior breach." City of Trenton v. Cannon
Cochran Mgmt. Servs., Inc., 2011 WL 3241579, at *4 (N.J. Super.
Ct. App. Div. Aug. 1, 2011).

This is a widely-followed principle of contemporary contract law
in New Jersey. See Q of Hasbrouck Heights, L.L.C. v. Qdoba
Rest. Corp., 2020 WL 13828986, at *4 n.9 (D.N.J. Sept. 3, 2020)
(cleaned up) (applying New Jersey law); see also Dautrich v.
Nationstar Mortg., LLC, 2018 WL 3201786, at *7 (D.N.J. June 29,
2018) (same).[16]

And it is reflected in a decision of New Jersey's highest court.
In 1907, the New Jersey Court of Errors and Appeals[17] considered

---

[16] In a related vein, courts applying New Jersey law often allow
plaintiffs to sue for breach of contract even where they did not
fully perform. See, e.g, New York-Connecticut Dev. Corp. v.
Blinds-To-Go (U.S.) Inc., 449 N.J. Super. 542, 558 (App. Div.
2017); Red Roof Franchising, LLC v. Patel, 877 F. Supp. 2d 124,
134 (D.N.J. 2012), aff'd, 564 F. App'x 685 (3d Cir. 2014);
Ramada Franchise Sys., Inc. v. Eagle Hosp. Grp., 2005 WL
1490975, at *10 (D.N.J. June 23, 2005).

[17] The New Jersey Court of Errors and Appeals was the state's
highest court until ratification of the New Jersey Constitution
of 1947, see 40 N.J. Prac., App. Prac. and Proc. § 1:1 (2d ed.
2022), and decisions of that court remain binding. See, e.g.,
Nixon v. Lawhon, 32 N.J. Super. 351, 355 (App. Div. 1954); see
generally Nelson Johnson, Battleground New Jersey: Vanderbilt,
Hague, and Their Fight for Justice (2014) (describing the run-up
to the 1947 Constitution, with emphasis on court re-
structuring).  When, as here, a federal court sitting in
diversity must determine the content of state law, "the
decisions of the [New Jersey] Supreme Court are the
authoritative source." Spence v. ESAB Grp., Inc., 623 F.3d 212,

a breach of contract appeal involving the sale of belts.  See
Kinney v. Federal Laundry, Co., 75 N.J.L. 498 (1907).  The
contract required the buyer to pay the purchase price within
sixty days of delivery.  See id. at 499.  The contract also
required the seller to replace any belts that were found to be
defective within three months of use.  See id. at 498.  The
buyer did not pay for the belts, and the seller did not replace
certain belts that were later found to be defective.  See id.
The seller sued the buyer for breach of contract for its non-
payment.  See id.

The buyer's defense: the seller's failure to replace the
defective belts "constituted a bar to the plaintiff's right to
recover."  Id. at 498-99.

The court rejected this argument, emphasizing that the seller's
later non-performance did not prevent the seller from
maintaining a breach of contract suit against the buyer.  The
seller's non-performance "raises a cause of action merely and
does not constitute a bar to the right of the party making it to
recover for a breach of the promise made to him."  Id. at 499.
And this principle, the court reasoned, "prevails as fully where
the promise is to pay money as where it is to do some other
thing."  Id.

In short, the legal rule here --- that "a party in breach of
contract cannot rely on the other party's subsequent failure to
perform to excuse its own prior breach," City of Trenton, 2011
WL 3241579, at *4 --- is a longstanding part of New Jersey law,
reflected in the above-described 1907 decision from the state's
then-highest court.

The referenced legal rule is also a basic principle of Anglo-
American law.

---

216 (3d Cir. 2010).  Decisions of the New Jersey Court of Errors
and Appeals are also an "authoritative source."

It has been followed throughout the United States.[18]  And it was
followed in England.[19]

---

[18] See e.g., Bartush-Schnitzius Foods Co. v. Cimco Refrigeration,
Inc., 518 S.W.3d 432, 437 (Tex. 2017) (applying Texas law,
plaintiff's later failure to pay "does not discharge a claim for
damages that has already arisen"); accord Arya Risk Mgmt. Sys.,
Pvt. Ltd. v. Dufossat Cap. Puerto Rico, LLC, 2022 WL 1644530, at
*22 (S.D. Tex. May 24, 2022); see also Gaucher v. Waterhouse,
175 N.H. 291, 296 (2022) (applying New Hampshire law, "a
material breach excuses future performance, not past
performance"); Hoffman v. McLaughlin Corp., 703 A.2d 1107, 1112
(R.I. 1997) (applying Rhode Island law, plaintiff's later
wrongful termination of a contract did not prevent suit for
defendant's prior breach); Sitlington v. Fulton, 281 F.2d 552,
556 (10th Cir. 1960) (applying Oklahoma law, plaintiff's later
refusal to pay did not prevent suit for breach of contract for
defendant's previous breach); Am. Emigrant Co. v. Adams Cnty.,
100 U.S. 61, 70-71 (1879) (plaintiff's failure to perform a
future obligation did not prevent a suit for the defendant's
prior breach); Front St., Mission & Ocean R. Co. v. Butler, 50
Cal. 574, 577-78 (1875) (applying California law, plaintiff's
later breach did not prevent recovery for defendant's prior
breach); Tipton v. Feitner, 20 N.Y. 423, 430-31 (1859) (applying
New York Law, plaintiff's later breach did not prevent recovery
for defendant's prior breach).

[19] See, e.g., Carpenter v. Cresswell, 4 Bing. 409 (1827);
Campbell v. Jones, 6 T. R. 570 (1796).  Old English common law
cases matter here because the New Jersey Constitution of 1776
provides: "the Common Law of England . . . as ha[s] been
heretofore practised in this Colony, shall still remain in
Force, until [it] shall be altered by a future Law of the
Legislature[.]"  N.J. Const. of 1776, art. XXII (1776); see
generally Ford W. Hall, The Common Law: An Account of its
Reception in the United States, 4 Vand. L. Rev. 791, 799-800
(1951).  There is no suggestion that the English breach of
contract rule at issue here was "altered."

It has been followed for hundreds of years --- in this century,[20] in the 20th century,[21] in the 19th century,[22] and in the 18th century.[23]

And it has been embraced by the leading secondary sources.[24]

\*     \*     \*

In short: under New Jersey law "[a] party in breach of contract cannot rely on the other party's subsequent failure to perform to excuse its own prior breach." City of Trenton, 2011 WL 3241579, at \*4.

But that is what the Defendant is trying to do.  The Defendant argues that the Resident's December 2019 failure to pay under the contract prevents her from recovering for the Defendant's pre-December 2019 breaches of that contract.

But the Defendant ("a party in breach of contract") "cannot rely" on the Resident's later non-payment of contractually-required fees ("the other party's subsequent failure to perform"), "to excuse its [the Defendant's] own prior breach."

---

[20] See, e.g., Bartush-Schnitzius Foods Co., 518 S.W.3d at 437; Arya Risk Mgmt. Sys., Pvt. Ltd., 2022 WL 1644530, at \*22; accord Gaucher, 175 N.H. at 296.

[21] See, e.g., Hoffman, 703 A.2d at 1112; Sitlington, 281 F.2d at 556.

[22] See, e.g., Am. Emigrant Co., 100 U.S. at 70-71; Front St., Mission & Ocean R. Co., 50 Cal. at 577-78; Tipton, 20 N.Y. at 430-31; Carpenter, 4 Bing. 409.

[23] See, e.g., Campbell, 6 T. R. 570.

[24] See, e.g., Restatement (Second) of Contracts § 237, Comments & Illustrations at 11 (1981) ("[a] claim for damages that has already arisen as a result of a claim for partial breach is not discharged" by the claiming party's later failure to render performance); see also Farnsworth & Wolfe, Farnsworth on Contracts, § 8.16 at n.12.

Put differently, the Defendant cannot use the Resident's breach of contract to avoid responsibility for its own earlier breach of the same contract.[25]

### B. Damages

The Defendant presses two additional arguments as to why it is entitled to summary judgment on the breach of contract claim. These arguments relate to damages.

First, in her papers opposing summary judgment, the Plaintiff asserted that she is seeking restitution, see Opposition to Summary Judgment at 10-11 --- but the Defendant argues this is a "new" contention.  Summary Judgment Reply Memorandum at 6.

It is not.  The complaint sought a return of "all . . . funds" paid under the contract.  See Complaint at 4.  An interrogatory response said: "Plaintiff has been damaged --- at a minimum --- in the amount of all monies she and her mother paid to Defendant

---

[25] The Court need not, and therefore does not, decide whether the Plaintiff could also potentially recover for breaches of contract that occurred after she stopped making payments in December 2019.  See generally Frank Stamato & Co. v. Borough of Lodi, 4 N.J. 14, 21 (1950) (noting that a breach by one party may potentially excuse further performance by the other party if that other party renounces or repudiates the remainder of the contract and stops receiving benefits under it).  There is at least one such alleged breach.  The relevant contract included the right to be "free from physical . . . neglect."  Residency Agreement at 21.  The Plaintiff has put forward evidence the Defendant intentionally did not feed the Resident.  See Affidavit of Administrator ¶¶ 44-45; Deposition of Administrator at 41:24-42:18, 72:19-73:3.  But this is said to have happened only after the Resident stopped paying her bills.  See Affidavit of Administrator ¶¶ 44-45.  (Indeed, the Administrator testified food was withheld in "retaliation" for non-payment.  See id. ¶¶ 43-44.)

for Defendant's negligent and almost non-existent service."
Plaintiff's Response to Interrogatories ¶ 4.

These filings do not use the word restitution.  But that is, in
substance, what they invoked.  Restitution "restore[s] to the
Plaintiff the specific thing[s] [s]he lost[.]"  Douglas Laycock,
The Scope and Significance of Restitution, 67 Tex. L. Rev. 1277,
1279-80 (1989).  Here, the "thing[s] [s]he lost" are the fees
the Resident paid to the facility --- "all . . . funds," as the
complaint puts it, "all monies" as the interrogatory response
puts it.

The Defendant's second damages-related argument is that the
Plaintiff has not laid a sufficient foundation for a "fair and
reasonable estimate regarding damages."  See Motion for Summary
Judgment at 6-8.

But "mere uncertainty as to the quantum of damages is an
insufficient basis" to deny relief.  Totaro, Duffy, Cannova &
Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 14
(2007).  "[T]he loss must be a reasonably certain consequence of
the breach . . . [but] the exact amount of the loss need not be
certain."  Id. (cleaned up); see also Donovan v. Bachstadt, 91
N.J. 434, 445, (1982).  "Where a wrong has been committed, and
it is certain that damages have resulted, mere uncertainty as to
the amount will not preclude recovery[.]"  Kozlowski v.
Kozlowski, 80 N.J. 378, 388 (1979).

Here, it is "reasonably certain," Totaro, Duffy, Cannova & Co.,
L.L.C., 191 N.J. at 14, that if the Plaintiff's evidence stands
up at trial, "damages have resulted[.]"  Kozlowski, 80 N.J. at
388.  If in the end a jury finds that the Plaintiff's room was
persistently unsanitary, that she was left sitting in urine, and
that she was intentionally isolated --- then damages would be
all-but sure to follow.[26]

_____

[26] At varying places in its papers, the Defendant suggests it has
been unfairly prevented from conducting certain damages-related
discovery.  See Summary Judgment Reply at 6-7; cf. Motion for
Summary Judgment at 6-7.  This argument is not possible to
evaluate here.  But it could at least conceivably form a basis
for a motion in limine to limit the damages the Plaintiff can
ultimately claim.  And it could also be a possible basis for a
motion to reopen discovery.  But it is not a reason for granting

### C. Conclusion

The Defendant has made two arguments as to why it is entitled to summary judgment on the breach of contract claim.  One relates to the Resident's stopping payment.  See Part V.A.  The other relates to damages.  See Part V.B.  Neither argument is persuasive, for the reasons set out above.  The Defendant's motion for summary judgment is therefore denied as to the breach of contract claim.

### VI.   Intentional Infliction of Emotional Distress

The Plaintiff also claims intentional infliction of emotional distress.  See Complaint ¶¶ 24-29.

The Defendant seeks summary judgment on this claim, for three reasons.

### A. Physical Injury

The Defendant's first argument: it should get summary judgment because there is no proof the Resident received medical care for a physical injury she is said to have sustained in connection with her alleged emotional distress.  See Motion for Summary Judgment at 9-10; Summary Judgment Reply at 9.

But whether the Resident can or cannot prove up a physical injury does not matter here.  This is because the Resident's claim is that conduct directed at her caused emotional distress.  And "when the intentional conduct is directed at the plaintiff, he or she need not prove any physical injury."  Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 367 (1988); see also Morgan v. Union Cnty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 354 (App. Div. 1993).[27]

### B. Expert Testimony

_____

the Defendant's current summary judgment motion.

[27] This is not the rule in some other places.  See, e.g., 136 Am. Jur. Proof of Facts 3d 175, § 19 (2013) (2013) ("In some jurisdictions, the plaintiff is required to allege and prove physical symptomatology resulting from the [defendant's] alleged improper conduct . . . and in certain cases [the physical symptoms] must be supported by medical evidence.").  But it is the rule in New Jersey.

The Defendant next argues expert testimony is required on an intentional infliction of emotional distress claim --- and notes the Plaintiff did not offer up an expert.  See Motion for Summary Judgment at 9-11.

In a diversity case like this one, the question of whether a certain sort of proof is required might be governed by federal or state law, depending on whether the proof requirement is thought of as "procedural" or "substantive."  See generally Collins v. Mary Kay, Inc., 874 F.3d 176, 181 (3d Cir. 2017) ("federal courts sitting in diversity jurisdiction apply state law to substantive issues and federal law to procedural issues").

Here, the parties assume state law is controlling, and in particular New Jersey law.  Therefore, the Court follows New Jersey law.  See TekDoc Servs., LLC, at *10 n.12; Alphonse Hotel Corp., 828 at 152; Pre-Settlement Fin., LLC, 2020 WL 5743036, at *4 n.3.

Under New Jersey law, is expert testimony needed to make out an intentional infliction of emotional distress claim?

As to the content of New Jersey law in this context, "the decisions of the [New Jersey] Supreme Court are the authoritative source." Spence, 623 F.3d at 216.  But the New Jersey Supreme Court has not issued a "controlling decision," Popa v. Harriet Carter Gifts, Inc., 52 F.4th 121, 125 (3d Cir. 2022), Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000), on the expert testimony question.[28]

---

[28] The New Jersey Supreme Court has suggested that a claim for emotional distress under the New Jersey Law Against Discrimination can be made without relying on expert testimony. See Rendine v. Pantzer, 141 N.J. 292, 312 (1995).  But it appears that relevant aspects of Rendine do not apply outside of the antidiscrimination context.  See Tarr v. Ciasulli, 181 N.J. 70, 82 (2004) ("compensatory damages for [Law Against Discrimination] emotional distress . . . require a far less stringent standard of proof than that required for a tort-based emotional distress cause of action"); see also Cuevas v. Wentworth Grp., 226 N.J. 480, 511 (2016), holding modified on other grounds by Orientale v. Jennings, 239 N.J. 569 (2019); Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 552 (2013).  Note also that the New Jersey Supreme Court has

As such, the Court would ordinarily need to "predict" how the Supreme Court will resolve the issue. See Spence, 623 F.3d at 216.

But that is not necessary here.

There are two basic approaches under New Jersey law as to whether expert testimony is required on an intentional infliction of emotional distress claim.

The Court predicts the New Jersey Supreme Court, when it reaches the issue, will adopt one of these two approaches.[29]

And under either of these two approaches, there would not be a need in this case for expert testimony.  To see why, consider the two approaches --- "common knowledge," and "genuine and serious mental distress."

### 1. Common Knowledge

---

considered a common law emotional distress claim as to which, it seems, there was no expert testimony. See DeAngelis v. Hill, 180 N.J. 1, 20 (2004) ("plaintiff's proof of emotional distress was limited to his testimony").  The Supreme Court did not suggest this was a problem.  But it is not apparent the expert testimony question was brought to the Supreme Court's attention.  And "[i]t is universally recognized that questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." Webster v. Fall, 266 U.S. 507, 511 (1925) (cleaned up); see also United States v. More, 7 U.S. 159, 172 (1805) (Chief Justice Marshall at oral argument, making a similar point).

[29] Why?  Because the two approaches have between them been followed by various New Jersey intermediate appellate courts and by federal courts applying New Jersey law.  And in predicting how the New Jersey Supreme Court will ultimately resolve a legal issue, particular weight is given to decisions of state intermediate appellate courts, see Robinson v. Jiffy Exec. Limousine Co., 4 F.3d 237, 242 (3d Cir. 1993), Schulman v. Zoetis, Inc., 2023 WL 4539476, at *2 (D.N.J. July 14, 2023), and federal courts applying New Jersey law, see Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 92 (3d Cir. 2008), Schulman, 2023 WL 4539476, at *2.

Some courts, applying New Jersey intentional infliction of emotional distress law, have held that expert testimony is only required where "the matter to be dealt with is so esoteric that jurors of common knowledge and experience cannot form a valid judgment." Lankford v. City of Clifton Police Dep't, 546 F. Supp. 3d 296, 326 (D.N.J. 2021) (applying New Jersey law and quoting Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (N.J. 1982); accord Kounelis v. Sherrer, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (applying New Jersey law); cf. Esposito v. Little Egg Harbor Twp., 2012 WL 1495468, at *7 (D.N.J. Apr. 27, 2012) (applying New Jersey law); Wasmanski v. T.G.I. Friday's Inc., 2008 WL 2645357, at *4 (D.N.J. July 2, 2008) (applying New Jersey law).

But the Plaintiff here does not invoke emotional distress of any "esoteric" sort. Lankford, 546 F. Supp. 3d at 326. And there is nothing necessarily technical about some of the core questions here. Did the Resident, in fact, suffer from emotional distress? Does a tight-enough line run from the Resident's alleged living conditions (not being fed, living in an unsanitary room, siting in urine, being isolated) to her alleged emotional distress? These are variants on everyday questions. They are not beyond the understanding of "jurors of common knowledge and experience." Id. A jury can reach a "valid judgment" on these questions, with or without an expert.

In sum: should the New Jersey Supreme Court opt to follow the "common knowledge" approach, expert testimony would not be required in this case.

### 2. **Genuine and Serious Mental Distress**

At least one court has taken a second approach, holding that under New Jersey law "ordinarily, expert proof is required to establish emotional distress damages." Clark v. Nenna, 465 N.J. Super. 505, 513 (App. Div. 2020).[30] But Clark notes certain

---

[30] Clark concerned negligent infliction of emotional distress. See Clark, 465 N.J. Super. at 511-12, 514. But Clark treated the law of intentional infliction of emotional distress as binding. See, e.g., id. at 512 (citing Buckley). Accordingly, the Court assumes for present purposes that the holding of Clark (and the other cases it cites) as to expert testimony in negligence-based emotional distress cases also would also apply in intentional emotional distress cases, such as this one.

exceptions to this rule, including that expert testimony is not required where the "nature of the harm would have caused any reasonable person severe or genuine and substantial emotional distress." Id. at 514 (cleaned up).  In such "special circumstances," "an especial likelihood of genuine and serious mental distress . . . serves as a guarantee that the claim is not spurious." Id. (cleaned up); cf. Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 239 (App. Div. 2014), aff'd as modified, 224 N.J. 584 (2016); Hawkins v. Borough of Barrington, 2018 WL 3945768, at *5 (N.J. Super. Ct. App. Div. Aug. 17, 2018).

Under this second approach, expert testimony would also not be required in this case.

The Plaintiff's evidence is the Defendant repeatedly and intentionally did not feed the Resident.  See Affidavit of Administrator ¶¶ 44, 45; see also Deposition of Administrator at 41:24-43:3, 72:19-73:3.  The Administrator has also testified that the Resident was left "basically sitting in urine all day . . . many, many times."  Deposition of Administrator at 82:5-14; 96:17-21.

In addition, the Administrator has testified that, upon visiting, she would see "food all over [the Resident]." Id. at 60:13-16.  The refrigerator "always looked [to the Administrator] like there was some kind of spillage of some juices or something," and there was food on the tabletops and in the carpet. Id. at 61:11-24, 96:24-97:6.  The Administrator also testified facility personnel repeatedly failed to respond when the Resident requested assistance through her emergency pendent. See id. at 38:8-23.

Furthermore, the Plaintiff has presented evidence that the Resident was seated on her own for months, and not taken along on day trips. See Affidavit of Administrator ¶¶ 25, 27; Opposition to Summary Judgment, Ex. 3.

Moreover, the Plaintiff's evidence is the Resident's telephone was unplugged "continuously." See Affidavit of Administrator ¶¶ 37-40; Deposition of Administrator at 33:22-34:14.  Finally, there is evidence of an unauthorized entry into the Resident's

room by another person at the facility.  See Affidavit of Administrator ¶¶ 17-19; Deposition of Administrator at 122:2-24.

Adding up the above, and drawing all "reasonable inferences, Canada, 49 F.4th at 345, in favor of the Plaintiff, as the Court must, there is sufficient evidence, at this stage at least, to conclude that the Resident, an elderly person living on her own at a facility, was, among other things, intentionally not fed, isolated to a meaningful extent, and left in an unsanitary room, often sitting in urine.

All of this would lead to "an especial likelihood of genuine and serious mental distress." Clark, 465 N.J. at 515 (cleaned up).[31] And when such is the case, expert testimony is not needed.  See id.

\*     \*     \*

In sum, the Defendant argues that summary judgment should be granted on the intentional infliction of emotional distress claim because the Plaintiff has not put forth expert testimony.

But the Court predicts that, when the New Jersey Supreme Court considers this question, it will hold either: (1) that expert testimony is required only when the "common knowledge" test is not satisfied, or (2) that expert testimony is required only when the "genuine and serious mental distress" test is not satisfied.

Here, each of these tests is satisfied, and expert testimony would therefore not be required under either test.  Accordingly, the Plaintiff cannot be barred from recovery for not offering such testimony.

### C. Severity

---

[31]  Cf., e.g., Buckley, 111 N.J. at 369 (suggesting possible relevance, in an intentional infliction of emotional distress context, of a person's worries about not having enough food); Baglini v. Lauletta, 338 N.J. Super. 282, 307 (App. Div. 2001) (holding plaintiff can recover with "little or no proof" for emotional damage in suit for malicious use of process, because a "normal person" subjected to wrongful litigation would suffer some emotional distress).

The Defendant also argues for summary judgment because there is insufficient <u>admissible</u> evidence to show the sort of severe emotional distress that makes an intentional infliction of emotional distress claim actionable in New Jersey.  <u>See</u> Motion for Summary Judgment at 13.

But the Defendant has made only generic arguments as to the admissibility of the Plaintiff's evidence.  The Defendant has not "point[ed] out," <u>Celotex Corp.</u>, 477 U.S. at 325, important and specific pieces of evidence that are inadmissible, and explained in at least some detail why they cannot be relied on. <u>See</u> <u>generally</u> <u>id.</u> at 323 ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion.")  In addition, the Defendant has not sought to explain why the Resident's emotional distress cannot be inferred from the evidence described above in Part V.A.1, especially given the hearsay issues raised by the Resident's death.  <u>Cf.</u> <u>Innes</u>, 435 N.J. Super. at 241-42.

The question is something of a close one.  But the Court concludes the Defendant has not carried its "initial responsibility" of "point[ing] out," <u>Celotex Corp.</u>, 477 U.S. at 323, 325, the assertedly inadmissible evidence, and why it is inadmissible.[32]

## VII.  **Conversion**

The Plaintiff also pressed a conversion claim, alleging the Defendant improperly kept the Resident's furniture after she moved out of the facility.  <u>See</u> Complaint ¶¶ 21-23.

The Defendant moved for summary judgment on this claim, and the Plaintiff responded by stating that she "waives her conversion claim."  Opposition to Summary Judgment at 5.

This statement was made in writing, after the close of discovery, and in a court filing.  The Court construes it as a full and definitive abandonment of the Plaintiff's conversion

---

[32] Should the Defendant wish to file a supplement to its summary judgment motion on the asserted admissibility difficulties with the Plaintiff's evidence, the Defendant shall so indicate on or before November 6, 2023.  The Court will then consider the possibility of setting a briefing schedule on an application by the Defendant to file a summary judgment supplement.

claim.   Therefore, the Defendant is entitled to summary judgment.   See <u>Badalamenti</u> v. <u>Borough of Westville</u>, 2014 WL 4798617, at *6 (D.N.J. Sept. 26, 2014); <u>Antiskay</u> v. <u>Contemp. Graphics & Bindery Inc.</u>, 2013 WL 6858950, at *3 (D.N.J. Dec. 26, 2013); <u>Finizio</u> v. <u>Harrah's Atl. City Operating Co., LLC</u>, 2013 WL 12134140, at *1 (D.N.J. Oct. 28, 2013); <u>Durham</u> v. <u>Atlantic City Elec. Co.</u>, 2010 WL 3906673, at *11 (D.N.J. Sept. 28, 2010).

## VIII.        Conclusion

The Defendant's motion for summary judgment is denied as to the breach of contract claim and as to the intentional infliction of emotional distress claim.

The Defendant's motion is granted as to the conversion claim.

IT IS on this 29th day of September, 2023, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.